THE CHICAGO, BURLINGTON & QUINCY RAILROAD CO.

*v.*

THOMAS PAYNE, Administrator of

ALBERT Y. PAYNE, Deceased.

1. NEGLIGENCE—*of contributory negligence.* The doctrine, that any contributory negligence by the party injured, no matter how slight when compared with that of the defendant, will defeat a recovery in an action for damages resulting from the negligence of the defendant, has often been repudiated by this court. The rule is, that negligence, resulting in injury, is comparative, and it is not required that the plaintiff shall be free from all negligence himself, or that he shall exercise the highest possible degree of prudence and caution, to entitle him to recover, if it appear the defendant was guilty of a higher degree of negligence.

2. SAME—*what constitutes.* In an action against a railroad company to recover damages for injuries occasioned by the alleged negligence of the defendant's servants in the manner of running its trains, it appeared the accident occurred at a road crossing, near a populous city, the party injured attempting to cross the railway track in a buggy which was struck by the passing train. The crossing was of a dangerous character, and there was evidence sufficient for the jury to find that the servants of the company having the control of the particular train which did the injury, were well aware of that fact. It was *held,* if this were so, and there was evidence tending to show that they ran the train without the use of steam, upon a down grade, in a comparatively noiseless manner, and at a rapid rate of speed, without sounding the whistle or ringing the bell after they passed the whistle post, 80 rods from the crossing, when they had every reason to suppose that persons would be passing over the track on the highway, without opportunity of seeing the approaching train, then these facts were sufficient to warrant the jury in inferring recklessness of life and limb on the part of such servants, and that they were actuated by general malice and criminal misconduct, or very gross negligence.

3. RAILROADS—*of their duty as to the safety of road crossings.* A railroad company is under the statutory duty, in the construction of its road across a public highway, to restore the highway to its former state, or in a sufficient manner not to impair its usefulness. And if a highway can be restored in a manner not to impair its usefulness only by constructing the highway over the railway, it is the duty of the company to so restore it, and the omission is a breach of duty.

4. It is not the duty of the highway authorities, but of the railway company, to give such protection from peril caused by the railway at highway crossings.

5. INSTRUCTION—*need not set forth every element of the case.* In such an action, it is not an unusual, nor is it an objectionable, practice, where the plaintiff's counsel desires an instruction as to the rule of damages, to say to the jury that, if they find from the evidence that the defendant is guilty, as charged in the declaration, then the plaintiff is entitled to recover, and to define the measure of damages.

6. Such a mode obviates the necessity of stating, and perhaps reiterating, hypothetically, each element of the cause of action, before coming to the real point in the instruction.

7. SAME—*taking a case from the jury.* An instruction is properly refused which purports to take the case, when there is a conflict of testimony, away from the jury, by telling them how to find their verdict.

APPEAL from the Circuit Court of Hancock county; the Hon. JOSEPH SIBLEY, Judge, presiding.

. Messrs. BROWNING & BUSHNELL, for the appellant.

Messrs. SKINNER & MARSH, for the appellee.

Mr. JUSTICE McALLISTER delivered the opinion of the Court:

This is an appeal from the judgment of the Adams circuit court, rendered in an action brought under the act of 1853, by appellee, as administrator of Albert Y. Payne, deceased, against appellant, to recover, for the benefit of the next of kin of deceased, the damages resulting from his death, which was caused, as it is alleged, by the wrongful acts, neglect and default of appellant's servants.

The general grounds relied upon for reversal are: 1st, error in overruling appellant's motion for a new trial; 2d, error both as to giving and refusing instructions.

The first of these grounds is narrowed down, by the argument of appellant's counsel, to a single point, though that is presented in a double aspect, viz: that, by the uncontradicted evidence, or the clear weight and preponderance of evidence, the deceased was himself guilty of *gross,* or at least *some,* contributory negligence, and in either case there could be no recovery.

The doctrine, that any contributory negligence by the party injured, no matter how slight when compared with ·that of the defendant, will defeat a recovery, has been repeatedly repudiated by this court, and in no case more directly than in this, when previously before us, on appeal from a former judgment. *C., B. & Q. R. R. Co. v. Payne,* 49 Ill. 499.

But the questions remain to be considered under the first head of appellant's argument : Was the deceased guilty of the gross negligence imputed to him by counsel? And should the new trial have been granted ?

In seeking a solution of these questions, we find, from the voluminous evidence in the case, and the contrariety of its tendency, that, notwithstanding the effort of appellant's counsel to narrow the question down to a single phase, as though it rested upon the uncontradicted testimony of credible witnesses, we must, nevertheless, pursue the inquiry upon the broad proposition, whether the verdict is so clearly and manifestly against the weight and preponderance of the evidence on the whole case, as that we should reverse for that reason. To consider the question of negligence on the part of deceased apart and isolated from its relation to that of appellant's servants, is to disregard the very spirit of the rule by which such cases must be governed. See *Galena & Chicago Union Railroad Co.* v. *Jacobs,* 20 Ill. 478, for the rule of this court, and which it has been the intention to adhere to throughout the subsequent decisions.

The injury occurred just at evening on the 14th day of July, 1866, about two and a half miles from the city of Quincy, at a point where a common public road, leading from Quincy to Warsaw, in a northeast direction, is crossed by appellant's railroad. At this point, which is commonly known as the " Warsaw Crossing," the highway runs due north and south, and the railroad almost due east and west, so that they cross each other nearly at right angles. The crossing is in a hollow between two hills—that on the north being called Col. Jamison's Hill, and the one on the south the Streeter Hill. The top of the Streeter hill is about 31 feet higher than the crossing,

the distance being about 480 feet from the top of the hill to the crossing. Down this hill the highway runs in a cut varying from about 3 feet to 7 feet in depth, with an ordinary rail fence some 4 or 5 feet high on top of the embankment on the east side down to the crossing. The highway is 16 feet wide down to the crossing, and *there* it is only 12 feet wide, with a culvert on each side of it. East of the crossing the railroad itself runs in a cut, which is upwards of 7 feet deep at the crossing, upwards of 10 feet deep 150 feet east of it, and from that point it gradually lessens in depth until, at the distance of about 465 feet, it runs out upon the natural surface. About 80 rods east of the crossing was the ordinary whistle post, and there was no sign board at or near the crossing, as required by statute. From Cliola station, about five and a half miles east of the crossing, all the way to Quincy, there is an easy down grade, so that trains run from Cliola to Quincy without the use of steam, and at a rate of speed varying from fifteen to twenty-five miles per hour.

Such, substantially, was the relative situation of the Warsaw road and the railroad, when young Payne, the deceased, then being between nineteen and twenty years of age, with a steady horse attached to a top buggy, with two lads, William H. Jones and Charles Letton, riding with him, came down the Streeter hill, from the south, and approached the crossing. Just before them a man of the name of Donohue was driving, on a slow trot, with a buggy and a lady in it, and hearing or seeing no train, he passed over the track, and had gone the distance of only 15 or 20 feet over it when a freight train of appellant, from the east, passed the crossing at a fast rate of speed, and went on without stopping. Payne's horse was seen running back up the Streeter hill with nothing but the shafts of the buggy attached. The buggy was dashed into pieces, the fragments lying south of track. Payne and Jones were lying south of track on the west cattle guard. The latter was killed outright. Payne was breathing, but had one leg smashed, bone broken and flesh mangled. He died soon after.

Letton was badly injured, but survived.   From the description given of the accident by Long, who was upon a load of hay on the Jamison hill north, and going south towards the crossing, and having full view of the whole scene, the horse Payne was driving must have reached the railroad track as the train came on to the crossing, and then by suddenly whirling around in the narrow space of 12 feet between the cattle guards, so violently cramped the buggy as to tip and throw it against the corner of some of the passing cars.   Long saw the boys, over the engine or between the cars, throw up their hands, and immediately saw the horse running back up the Streeter hill. This witness could see the train from his position, but could hear no bell or whistle or other sound than the mere rumbling of cars; is quite positive that the boys were not driving fast, and from their position, with relation to Donohue, it is very probable that they were not.

The testimony relied upon by appellant's counsel, as showing negligence on the part of deceased, is the deposition of one Truman Streeter, taken in the State of Missouri.   He testifies, in substance, that at the time in question he had started to go south to Quincy, and when about three rods south of the Streeter hill, the boys passed him going north in a top buggy, the top being up, and, he says, the lines hooked up in the top; that the horse was going on a fast trot; the boys laughing and "cutting up, and seemed to be having a good time;" that he spoke to Jones, the only one of them he knew; that Jones turned his head and said "Now we go."   Just then witness heard the bell ring on the freight train; he could see the train; there was a space right then, he said, of two or three rods through which the train could, at a certain point, be seen.   He saw it at whistle post at that time, and halloed to the boys that the train was coming, and to look out.   He did not think they heard him.   He kept right on south, and when he had gone only three or four rods, saw the horse come running over the hill with the shafts attached to him.

A critical examination of the evidence shows that the testimony of this witness is in direct conflict with the circumstances detailed by Long and Donohue, who were directly on the spot, or in full view of the accident.

The story of Truman Streeter is of so improbable a character, so much against the instincts of human nature and the presumptions arising therefrom, as to require the most reliable evidence of its truth, before it could receive the credence of a sensible jury.

Payne, the counsel say, was familiar with the place. But he was a young man between nineteen and twenty years of age; was shown to possess good ordinary abilities, and to be of good habits. The crossing was at the foot of a steep hill, was only 12 feet wide, with culverts, or cattle guards, on either side. It is even assumed that they saw the train coming, or had ample warning of its approach; that, nevertheless, with lines out of reach, fastened at the top of the buggy, and with a shout "Now we go," they went "dashing down the hill," in the language of counsel, "and ran into the train." This could not be true as to a person of Payne's age, discretion and ability, without imputing to him a motive of self-destruction, and a majority of the court are of the opinion that the jury were warranted in finding against this theory, upon the whole evidence before them.

The fair deduction from the evidence is, that Payne's buggy followed close upon Donohue, who had got only 15 or 20 feet over the track when the train came along. It is also a fair conclusion from the evidence that, though the bell may have been rung at or a little east of the whistle post, yet, that as the train approached the crossing from the post, no bell was rung or whistle sounded. Donohue heard none. Long, who was near to the scene and an eye-witness of the accident in its main features, testifies that the bell was not rung or the whistle sounded, that no steam was used and all the sound heard was the rumbling which cars would naturally make in running at a fast rate of speed upon a down grade without

steam. Various other witnesses testify the same way. It may be, and probably is, true, that deceased, following after Donohue's buggy, did not stop as he approached the crossing, to either look or listen. This may have been negligence, but whether it was such as should defeat the recovery, was for the jury to determine, upon its comparison with that of appellant's servants.

This crossing, when considered with all the circumstances of the situation of the highway and railroad, must have been deemed by the jury to have been of a most dangerous character. No man of ordinary sense could consider its circumstances without arriving at that conclusion. The company was under the statutory duty to restore the highway to its former state, or in a sufficient manner not to impair its usefulness. Stat. 1849, p. 24. The peril of the crossing could have been avoided by the railway going under the highway, or, in other words, constructing the highway over the railway. If the highway could be restored in a manner not to impair its usefulness only in that way, it was the duty of the company to so restore it, and the omission was a breach of duty. It failed in its statutory obligation. It was not the duty of the highway authorities, but of the railroad company, to give this protection from the peril caused by the railroad.

The circumstances were all before the jury. The crossing was only two miles and a half from a populous city; was upon an old, much traveled highway, which was situated, with reference to the intersection of the railroad, as before detailed. Persons driving north upon the highway, and especially at that time of year, had very little, if any, opportunity of seeing a train approaching from the east, by the use of particular caution. By reason of the descending grade, trains came gliding down through the cut east of the crossing without the use of steam, and almost noiselessly, except a rumbling sound which could be heard with difficulty by one driving or riding in a vehicle upon the highway, so that the traveler on the highway was subject to imminent peril, and was almost wholly dependent

upon the servants of the company performing the statutory duty of ringing the bell or sounding the whistle, for any warning against that peril.

The company is chargeable with notice of all the perilous circumstances of a crossing constructed by itself. There was no sign board there to give warning, as required by statute. There was evidence sufficient for the jury to find that the servants of the company having the control of the particular train that did the injury were well aware of the dangerous character of the crossing. If this were so, and there is evidence tending to show that they ran the train without the use of steam down this grade in a comparatively noiseless manner and at a rapid rate of speed, without sounding the whistle or ringing the bell after they passed the whistle post, 80 rods east of the crossing, when they had every reason to suppose that persons would be passing over the track on the highway without opportunity of seeing the approaching train, then these facts were sufficient to warrant the jury in inferring recklessness of life and limb on the part of such servants, and that they were actuated by general malice and criminal misconduct, or very gross negligence.

It is the opinion of a majority of the court, that there was evidence strongly tending in that direction, and that the verdict of the jury so finding, and that the negligence of the deceased was slight when compared with that of the company and its servants, and that the negligence of the latter was gross, is not so against the clear weight and preponderance of the evidence as to justify this court in disturbing it.

The only instruction given on behalf of appellee, which is complained of, is the fifth, and is as follows:

"If the jury should find from the evidence that the defendant is guilty of the wrongful act, neglect or default, as charged in the plaintiff's declaration, and that the same resulted in the death of Albert Y. Payne, then the plaintiff is entitled to recover in this action, for the benefit of the next of kin of such deceased, such damages as the jury may deem, from the

evidence and proofs, a fair and just compensation, with reference to the pecuniary injuries resulting from such death, to such next of kin, not exceeding $5000."

The point of this instruction is the measure of damages, and in this respect is entirely correct. But appellant's counsel insists that it is wrong because it withdraws from the jury all consideration of the conduct of deceased.

We do not think the instruction obnoxious to criticism, as claimed. It is not an unusual, nor is it an objectionable, practice, where plaintiff's counsel desire an instruction as to the rule of damages, to say to the jury that, if they find from the evidence that the defendant is guilty, as charged in the declaration, then the plaintiff is entitled to recover, and to define the measure of damages. Such a mode obviates the necessity of stating, and perhaps reiterating, hypothetically, each element of the cause of action, before coming to the real point of the instruction.

The declaration here alleges that the death of Albert Y. Payne was caused by the wrongful acts, neglect and default of defendant's servants, while he was exercising due care.

The thirteenth instruction asked for on behalf of appellant was properly refused, because it purported to take the case, when there was a conflict of testimony, away from the jury, by telling them that no evidence had been given to the jury on the trial, tending to show that the deceased, Albert Y. Payne, took any precaution, or used any care or diligence, to avoid the accident, and that it was their duty, in view of all the evidence in the case, to find a verdict for the defendant.

All of the other instructions asked on behalf of the defendant, and refused, were substantially embraced in those which were given. We think the law was laid down most favorably for the defendant, and to the fullest extent to which it was entitled.

It is the opinion of a majority of the court that there is no substantial error in this record, and that the judgment of the court below should be affirmed.        *Judgment affirmed.*